426 So.2d 16 (1983)
THE FLORIDA BAR, Complainant,
v.
John H. JAMEISON, Jr., Respondent.
No. 59587.
Supreme Court of Florida.
January 13, 1983.
John F. Harkness, Jr., Executive Director and Stanley A. Spring, Staff Counsel, Tallahassee and David G. McGunegle, Bar Counsel, Orlando, for complainant.
Nolan Carter, Orlando, for respondent.
PER CURIAM.
This lawyer-discipline proceeding is before the Court on the complaint of The Florida Bar, the report of a referee, and the petitions of both parties for review. We have jurisdiction. Art. V, § 15, Fla. Const.
The Bar brought its complaint in six counts. The referee found respondent not guilty on three of the counts, and the Bar has not sought review of those determinations. The remaining three counts, upon which the referee found respondent guilty of misconduct, all arose out of respondent's relationship with one elderly client. The respondent has petitioned for review of the referee's findings of fact. The Bar has petitioned for review of the referee's recommended discipline of one year's suspension, and recommends that respondent be disbarred.
The referee recommended that respondent be found guilty of violating Florida Bar Code of Professional Responsibility, Disciplinary Rules 1-102, 2-106(A) and (B), 5-104(A), 6-101(A)(3), and 7-101(A)(3), based on the following findings of fact:
1. Respondent, John H. Jameison, Jr., is, and at all times hereinafter mentioned, was, a member of The Florida Bar, subject to the jurisdiction and discipline rules of The Supreme Court of Florida.
2. In the spring of 1978, Mr. Andrew G. Hvolbek attended a Masonic Lodge meeting in Mt. Dora, Florida, where he heard the respondent make a speech. He was very much impressed with respondent's personality at that time. Mr. Hvolbek was approximately 88 years old. In late 1980, after these proceedings were commenced, Mr. *17 Hvolbek became incompetent and remains so. He had been a Mason for over 60 years and was devoutly committed to the principles of Masonry and its members.
3. Upon hearing the respondent speak so well concerning the teachings of Masonry, Mr. Hvolbek decided he would seek respondent's services regarding an insurance problem. He wrote to respondent over a period of several weeks seeking his services regarding the insurance problem as well as the dissolution of a trust in a local bank, the making of a new Will, and the distribution of certain gifts of money to various organizations and persons. Finally, the respondent got in touch with Mr. Hvolbek in the early part of August, 1978.
4. Upon the first meeting of the parties, Mr. Hvolbek was so taken with the respondent's personality he revealed his complete financial picture to the respondent. He had approximately $47,000.00 in a trust account and savings account. Mr. Hvolbek wanted the respondent to run against Richard Kelly in the next election. He offered respondent $25,000 for his campaign if he would run against Kelly and then, later, respondent would become President of the United States. He also wanted to liquidate his trust with a local bank so as to make gifts to Masonic organizations, individuals and relatives.
5. Respondent refused to consider running against Richard Kelly; however, he then told Mr. Hvolbek about a plan respondent and his wife had about wanting to establish a foundation to help youthful offenders. Mr. Hvolbek thought that the plan was a great idea and would fit within the teachings and ideology of Masonry. Respondent suggested Mr. Hvolbek make a gift of $20,000.00 to be used as seed money for the foundation which was done.
6. The evidence reveals at the time the parties met in August, 1978, the respondent was practicing law in Orlando and had, up until recently, been practicing law in Mt. Dora, Florida, for approximately three years and had been quite active in civic affairs in that community. He was married to a professional faith healer. He also conducted a talk show from a radio station in Orlando for several months. The respondent and his wife were living in Orlando, Florida, in the Presidential Suite in a local highrise complex overlooking Lake Eola. He maintained his law office and living quarters in the Presidential Suite. Both husband and wife worked closely together in the conduct of a counseling and faith healing business in the apartment.
7. Immediately after the first conference between Mr. Hvolbek and the respondent, the respondent apparently put everything aside to devote to the wishes and business of Mr. Hvolbek. Many conferences were conducted in the Jameisons' apartment between the parties. Mr. Hvolbek was invited from time-to-time to spend the night in the apartment so that details could be worked out concerning the gifts, the making of a new Will and the setting up of the foundation. It is clear from the record and the reasonable inferences to be drawn therefrom, the respondent had the complete trust and confidence of Mr. Hvolbek from the time he met him until the middle part of February, 1979.
8. In August, 1978, respondent arranged a separate bank account for Mr. Hvolbek to make gifts to several Masonic organizations, other individuals and a foundation to be established by the respondent.
9. On or about August 15, 1978, respondent and Mr. Hvolbek went to The First National Bank of Mt. Dora where they arranged for the revocation of Mr. Hvolbek's 1973 living trust and for liquidation of all of its assets. The trust's net proceeds as of the end of August were over $43,000. These assets were subsequently deposited in a special distribution account, number 39-5552, at the same bank. It was a joint account with right of survivorship in the names of the respondent and Mr. Hvolbek.
10. On or about August 18, 1978, Mr. Hvolbek executed a new Last Will and Testament prepared by the respondent as well as a document entitled "Special Distribution Account Instructions for Account No. 39-5552." Both documents were executed in the office of Charles E. Brooks, III, Trust *18 Officer of The First National Bank of Mt. Dora. Respondent received $975 in legal fees from the special account in August, 1978.
11. Article V of the new Will referred to the Andrew G. Hvolbek special distribution Account No. 39-5552 which latter document provided for several distributions to Masonic Lodges in New York and Florida as well as disbursement of $20,000 to the respondent to be utilized for humanitarian purposes through an organization yet to be established. The instructions also directed the respondent to distribute to himself such amounts as would compensate him for his professional services.
12. On or about October 17, 1978, Mr. Hvolbek executed a document entitled "First Amended Distribution Instructions for Account No. 39-5552," which, reduced two gifts and instructed respondent to reduce to a final bill, all past, present, and future professional fees. On or about October 26, 1978, Mr. Hvolbek executed a document entitled "Second Amended Distribution Instructions for Account No. 39-5552" which provided for a $5,000 disbursement to the respondent, who had previously received $975 in August, 1978, as compensation for all past, present and future services.
13. On January 22, 1979, Mr. Hvolbek executed a document entitled "Third Amended Distribution Instructions for Account No. 39-5552" which instructed the respondent to invest $10,000 in an interest earning six-month money market certificate to be purchased through a savings and loan association.
14. All of the aforementioned documents were executed in the offices of the trust officer of The First National Bank of Mt. Dora. In each case, respondent advised the trust officer he had instructed Mr. Hvolbek of the documents' contents. Mr. Hvolbek executed each document in the presence of the trust officer and other witnesses. The evidence is clear that at this time Mr. Hvolbek was suffering from a serious hearing deficiency, but could read without the aid of glasses. There is no evidence that he did not possess testamentary capacity at this time. There is no evidence Mr. Hvolbek read the instruments before executing same.
15. On or about November 1, 1978, the respondent established the "Jameison Foundation" which stated purpose was to "help people help themselves by more effectively utilizing some basic fundamental principles in counseling hyperactive children and helping troubled youth." The genesis of this foundation occurred during the previous summer at or about the time Mr. Hvolbek determined to place through respondent's request and urging, the $20,000.00 in paragraph eleven above as seed money which was transferred to respondent's trust account by check dated September 18, 1978.
16. The Jameison Foundation was and is located at respondent's law office address. The three-member Board of Trustees of the Foundation included both respondent and his wife, Robyn Jameison.
17. The respondent hired an Orlando law firm to draw up the legal papers for the establishment of the foundation. The charter is drawn in such a manner as to give both the respondent and his wife complete control of the foundation including unlimited control of policy making and the spending of funds.
18. During approximately the first year of operations of the Jameison Foundation, substantially all of the money in the foundation was represented by the $20,000 given by Mr. Hvolbek. Several disbursements for operating expenses of the foundation were made during this period of time including travel expenses for the respondent and his wife to the San Francisco area for approximately $1,475. Almost all of Mr. Hvolbek's "seed money" was expended during the first year of the foundation's operations.
19. A close analysis of the financial records clearly reveals that the vast majority of the seed money was consumed to further law office expenses as well as the promotional aspects of the faith healing business of the respondent and his wife. A few hundred dollars were spent directly for the benefit of needy youths.
*19 20. The Jameison Foundation had a Board of Directors consisting of the respondent, his wife, and respondent's secretary. Later the secretary resigned and was replaced by Mr. Arthur Charles Forrester who is a past district grand master and past master of Pine Castle Lodge of F. & A.M. Mr. Forrester testified that he has not attended any meetings of the Board of Directors of the Jameison Foundation. The business of the Board was transacted over the telephone. The foundation is now inactive.
21. During late 1978 and early 1979, the respondent made disbursements required by the special distribution account except instructions for a gift originally to Nicole Priore which was later changed on January 22, 1979, in both amount and recipients. He had Mr. Hvolbek pre-sign several of the account checks and took care of the rest. This one has not been funded although more than enough money was transferred into a savings account on January 22, 1979. The special account was depleted on February 2, 1979, to purchase the $10,000 certificate of deposit mentioned in paragraph 13 above.
22. It further appears from the record that the respondent withdrew $10,000 from the special account on February 3, 1979, and then transferred it ... to his law office trust account, where it remained until a certificate of deposit was purchased on February 21, 1979 from the Dade Federal Savings and Loan Association in Orlando, Florida.
23. It appears from the record that Mr. Hvolbek became alarmed when the certificate of deposit had not been sent to him by the respondent after the elapse of approximately two weeks after January 22, 1979. On February 11, 1979, he sought help from a Mr. James W. Geddes, who was the secretary of the Mt. Dora Masonic Lodge. Mr. Geddes in turn undertook discreetly to inquire into the situation. As a result, Mr. Hvolbek was advised to seek the advice and service of an attorney in Mt. Dora.
24. Attorney Del Potter of Mt. Dora was engaged by Mr. Hvolbek to obtain an accounting and recover assets being held by the respondent. Notwithstanding several letters between the new attorney and the respondent, no accounting for Mr. Hvolbek's $20,000.00 given to the Jameison Foundation was furnished by the respondent or anyone else from the foundation. Additionally, the respondent refused to discuss any possible reduction of his fees which then totaled $5,975.00. Later respondent prepared a statement of services rendered to Mr. Hvolbek after the August fees showing 131 hours spent at the rate of $150.00 per hour for a total due of $19,650.00. A greater portion of the hours spent by the respondent was to further the interest of the Jameison Foundation in trying to attract more financial support from civic clubs and fraternal organizations and not for the benefit of Mr. Hvolbek.
25. It clearly appears from the record that the last contact the respondent had with Mr. Hvolbek was on January 22, 1979, until his new attorney wrote to respondent during the middle part of April, 1979. In the meantime the respondent waited until February 21, 1979, to purchase a $10,000.00 certificate of deposit from the Dade Federal Savings and Loan Association in Orlando.
26. He purportedly mailed the certificate of deposit by ordinary mail to Mr. Hvolbek the following day together with a signature card to be mailed directly to the bank. The certificate of deposit was titled in the joint names of respondent and Mr. Hvolbek with right of survivorship  not in respondent's name as trustee or executor.
27. On March 26, 1979, the bank informed the respondent it had not received the signature card from Mr. Hvolbek. Without trying to get in touch with his client respondent went to the bank and executed a lost certificate affidavit without reading the contents. Several weeks elapsed until finally Mr. Del Potter wrote to the respondent asking for an accounting and for the $10,000.00. The respondent wrote back stating a certificate of deposit had been purchased at Dade Federal in the sole name of Mr. Hvolbek and he again purported to enclose the necessary papers *20 for Mr. Hvolbek to sign and send to the bank. The papers were not included in the letter addressed to Mr. Potter.
28. Finally in June, Mr. Potter learned that the certificate of deposit was in joint names of respondent and Mr. Hvolbek instead of the sole name of Mr. Hvolbek. It was about this time when it became known by Mr. Hvolbek and his attorney the original certificate of deposit was purportedly "lost in the mail" or somewhere else. Steps were taken to replace the "lost" certificate of title.
29. During the period of time which immediately preceded the decision by Mr. Hvolbek in August, 1978, to place $20,000 in the as yet unformed foundation, the respondent represented to him that the course of action mentioned in the preceding paragraphs including the establishment of the special distribution account and elimination of his Living Trust would best effectuate his desires with respect to his gifts to the Masonic Lodge and others. In fact, all such disbursements could have been made through the then existing trust.
30. The respondent failed to advise or encourage Mr. Hvolbek to seek out independent counsel prior to his placing $20,000 in September, 1978, into the yet unborn Jameison Foundation notwithstanding respondent's central role in the foundation and as attorney for the major benefactor.
31. Respondent's primary purpose was to acquire substantial amounts of seed money to effectuate his own personal foundation and did not meet the fiduciary responsibilities he owed to his client, Mr. Hvolbek.
32. The respondent is guilty of gross neglect in the manner in which he conducted himself concerning the handling of his client's affairs in the purchasing of the certificate of deposit and the withholding of information from his client concerning the lost certificate until forced to do so.
... .

COUNT IV (09B79C74)
1. For his services in August, 1978, the respondent received two checks totaling $975 from the special account.
2. Pursuant to the Second Amended Instructions executed on October 26, 1978, respondent was to be paid $5,000 as compensation for all past, present and future services for Mr. Hvolbek. This money was paid to him by a check dated October 27, 1978, from the special distribution account with the notation "life retainer fee."
3. After Mr. Hvolbek became disenchanted in 1979 and sought independent counsel, the latter requested respondent make a reduction in the fee paid to him. Respondent refused. At some time subsequent to 1979, respondent prepared a statement of services rendered showing 131 hours spent after the August 1978 payments at the rate of $150.00 per hour. This appears to have been a showing to Mr. Hvolbek that respondent had furnished services the value of which was far in excess of the $5,000.00 life retainer.
4. After a careful review of the evidence it is found that respondent's value of his services at the rate of $150.00 per hour is clearly unconscionable and excessive. The quality of work performed by him as exhibited by the legal papers drawn, the amount of monies involved and the number of gifts clearly reveal the fees collected are far in excess of the reasonable value of like legal services in the community. The services rendered in connection with the foundation should not be charged to Mr. Hvolbek.
... .
Having considered the arguments of both parties regarding the recommended findings of fact and recommended discipline, we approve the referee's findings of misconduct.
However, we conclude from the record that respondent's actions were not committed with criminal mens rea or corrupt motive, but rather resulted from failure to foresee the potential conflict of interest, a lack of properly strict record keeping, and failure to act promptly in response to the client's wishes.
*21 Based upon such misconduct, we impose discipline as follows. The respondent is suspended from the practice of law for ninety days. As a condition of reinstatement, respondent will be required to successfully complete the Multistate Professional Responsibility Examination by attaining a scaled score of 70 or better on such examination. See Art. VI, Fla.Sup.Ct. Bar Admiss. Rule. Following reinstatement respondent will be on probation for a period of one year. As a further condition of reinstatement, respondent will pay The Florida Bar's costs in these proceedings.
The suspension shall be effective February 14, 1983, thereby giving respondent time to close out his practice and take the necessary steps to protect his clients, and it is ordered that respondent shall not accept any new business. Costs in the amount of $665.17 are hereby taxed against the respondent.
It is so ordered.
ALDERMAN, C.J., and OVERTON, McDONALD and EHRLICH, JJ., concur.
BOYD, J., dissents with an opinion with which ADKINS, J., concurs.
BOYD, Justice, dissenting.
I dissent to the majority opinion finding misconduct and imposing discipline because I believe a proper review of the record reveals that there was no clear and convincing evidence of ethical violations. I would dismiss the Florida Bar's complaint.
The evidence showed that respondent was an idealistic young lawyer who was very active in community affairs. As a member of the Sertoma Club, respondent worked on community service projects. He was also the moderator of a radio panel discussion or "talk show." Prior to entering the practice of law, respondent studied psychology and operated an aid center for troubled people in Washington, D.C.
Respondent's wife was a psychologist and worked as a professional counselor. Respondent and his wife lived in an apartment on the top floor of an old hotel in the inner-city area of Orlando (or, as the referee put it, "the Presidential Suite in a local highrise complex overlooking Lake Eola"). This hotel suite also housed the offices of respondent's law practice and his wife's counseling practice. The couple seem to have shared a deep interest in spirituality and its potential for helping people solve their personal problems and achieve goals in life.
In the spring of 1978, Andrew G. Hvolbek, of Mt. Dora, attended a Masonic Lodge meeting in that city, where he heard respondent speak. Mr. Hvolbek had also heard respondent speak on the radio. Mr. Hvolbek was favorably impressed with respondent's personality and speaking ability. Mr. Hvolbek was in his late eighties at the time. He was competent and, some witnesses said, mentally astute. He had been a Mason for over sixty years and was attracted to the idealistic younger Mason, the respondent.
At considerable effort, Mr. Hvolbek eventually got in touch with respondent. Being of the opinion that a political career would be the best natural outlet for a person of respondent's talents, Mr. Hvolbek offered to contribute $30,000 to help finance a campaign if respondent would attempt to unseat then-incumbent Representative Richard Kelly. Respondent declined the opportunity to seek elective office, but gradually learned that Mr. Hvolbek was anxious to find causes worthy of his financial support.
In August, 1978, Mr. Hvolbek retained respondent to help him change the arrangements by which some of his personal wealth was held. The purpose was to get his assets liquidated and to facilitate the making of gifts to various individuals and organizations. Respondent arranged a new separate bank checking account for Mr. Hvolbek to make contributions from.
Aware of Mr. Hvolbek's desire to contribute to worthy causes, respondent told the older man about a plan he and his wife had to establish a foundation to support their efforts at helping wayward young people to improve their lives. Mr. Hvolbek greatly liked the idea and thought that it would *22 well carry out the principles and teachings of Masonry. Mr. Hvolbek agreed to contribute $20,000 for the purpose of getting the foundation started.
Also in August, 1978, respondent prepared a new will for Mr. Hvolbek. Mr. Hvolbek executed the new will in the office of the trust official of his bank. The will made reference to the newly established "special distribution account" from which there were to be made several gifts to Masonic Lodges. On September 18, 1978, Mr. Hvolbek authorized a disbursement of $20,000 to respondent for the purpose of establishing a foundation for humanitarian purposes. The instructions executed by Mr. Hvolbek also directed respondent to pay himself a fee for his professional services. Respondent received a fee of $975 at this time.
In October, 1978, Mr. Hvolbek amended his instructions pertaining to the special distribution account. He also instructed respondent to reduce to a fixed amount the fee for all his professional services thus far provided and yet to be provided. Shortly thereafter, Mr. Hvolbek authorized a payment of $5,000 to respondent for this "life retainer fee."
In November, 1978, respondent, through separate legal counsel, established the Jameison Foundation for the purpose of supporting efforts to guide, counsel, and otherwise aid troubled young people. The foundation was to be directed by a board of three trustees. Initially, respondent and his wife were both trustees of the foundation.
The referee found that Mr. Hvolbek's contribution to the foundation was used mostly for operating expenses and promotion, and that during the period of the foundation's active existence, only a few hundred dollars were expended directly for the benefit of persons in need. The referee also concluded that some of the promotional activities respondent and his wife engaged in were for the benefit of Mrs. Jameison's counseling practice.
In January, 1979, Mr. Hvolbek again amended the instructions regarding his special distribution account. At this time Mr. Hvolbek decided to remove some of his money from the gift-making account. He instructed respondent to withdraw $10,000 and invest it in the form of an interestbearing certificate of deposit.
In February, 1979, pursuant to Mr. Hvolbek's instructions, respondent withdrew $10,000 from the special distribution account and placed it in respondent's law office trust account. Three weeks later, respondent purchased the requested certificate of deposit. Respondent testified that he mailed the certificate to Mr. Hvolbek along with a signature card to be returned to the bank. Respondent said he later learned from the institution that issued the certificate that Mr. Hvolbek's signature card had not been received. Respondent concluded that the certificate of deposit had been lost in the mail, and took steps to replace it. Meanwhile, Mr. Hvolbek became concerned about not receiving his certificate of deposit and retained another attorney to inquire into the matter.
The referee concluded that respondent failed to advise Mr. Hvolbek that his desire to make charitable gifts could be effectuated without changing the financial arrangement by which the money was held and that it was unnecessary to establish the special distribution account over which respondent had signatory power. The referee also concluded that respondent, by way of his personal relationship with his client, induced Mr. Hvolbek to give $20,000 to establish a foundation without advising him to seek other legal advice and knowing that the money would be used to further respondent's personal objectives. The referee concluded that respondent purchased the certificate of deposit with the thought in mind that if Mr. Hvolbek died while both names appeared as signatories, the money would pass to respondent as surviving signatory.
Following Mr. Hvolbek's employment of a new attorney in the spring of 1979, the new attorney approached respondent concerning the $5,000 "life retainer fee" paid by Mr. Hvolbek. The new attorney wanted part of the fee returned on the ground that it was unearned. Respondent disagreed *23 and refused. In response to a request for documentation of the services respondent provided pursuant to the "life retainer fee" agreement, respondent submitted a statement of services rendered and hours spent subsequent to the payment of the $975.00 fee in August, 1978. The statement showed 131 hours spent and evaluated the services to be worth $150 per hour. The amount of fees thus computed was approximately $19,000. The referee apparently viewed this accounting as a bill for approximately $14,000 after crediting the earlier $5,000 payment.
Count I of the Bar's complaint charged improper conduct in the obtaining of the $20,000 gift to the Jameison Foundation. The referee found respondent guilty of misconduct, concluding that he induced the gift through personal influence, violated his fiduciary responsibility, and used the money to promote his personal ends. The referee found respondent guilty of violating the Code of Professional Responsibility, Disciplinary Rules 1-102(A)(4), 5-104(A), and 7-101(A)(3).[1]
Count II of the Bar's complaint charged misconduct in connection with respondent's purchase of the $10,000 certificate of deposit on behalf of Mr. Hvolbek. The referee concluded that the purchase of the certificate in the joint names of the lawyer and client was not necessary to respondent's role as trustee, and that it was done so that respondent might benefit in the event of Mr. Hvolbek's death. The referee found that respondent violated Disciplinary Rules 1-102(A)(4), 5-104(A), and 6-101(A)(3).[2]
Count IV of the Bar's complaint pertained to the statement respondent submitted after being asked about a possible refund of any unearned portion of the previously paid $5,000 legal fee. The Bar alleged that the statement was a bill for a balance due of $14,650, and that it was improper in view of respondent's previous agreement to serve for a total fee of $5,000. The referee found respondent guilty of violating Disciplinary Rules 2-106(A) and 2-106(B).[3]
Respondent argues that the referee could not reasonably have found that the allegations against him were proved by clear and convincing evidence. With regard to the first count, respondent argues that misconduct was not proved and that the referee ignored evidence: (1) that Mr. Hvolbeck was competent and mentally astute at the time he decided to give $20,000 to respondent for charitable purposes; (2) that respondent *24 fully advised Mr. Hvolbeck of the purposes of the foundation; (3) that Mr. Hvolbeck knowingly declined to consult legal counsel other than respondent.
In view of the conflicting evidence which respondent points out, I am unable to conclude that the misconduct found on count one was proved by clear and convincing evidence.
With regard to count two, respondent argues that the Bar wholly failed to prove any wrongful intent on respondent's part and that the referee's conclusions are unsupported by evidence. I would find that the facts shown by the evidence are insufficient to prove guilt by clear and convincing evidence. Mr. Hvolbeck gave respondent signatory power over his money because he trusted him and the Bar has failed to prove that respondent violated that trust. Nor is there any proof that respondent failed to act with reasonable promptness on any of his client's legal business.
With regard to the third count upon which misconduct was found, respondent argues that there was no evidence that respondent attempted to collect any fee payment from Mr. Hvolbeck beyond the $5,000 already paid. The evidence is clear that the statement in question was sent as justification for respondent's refusal to refund any of the $5,000 and was not a bill for a balance due of $14,000. The referee made no finding to the effect that the $5,000 itself was an illegal or clearly excessive fee under Disciplinary Rule 2-106(B).
In summary, I would conclude that there was not clear and convincing evidence sufficient to support the referee's findings of misconduct. We should therefore reject the referee's recommended findings of guilt and find that no misconduct was proved. Accordingly, I respectfully dissent.
ADKINS, J., concurs.
NOTES
[1] Disciplinary Rule 1-102(A)(4) provides: "A lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

Rule 5-104(A) provides:
A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.
Rule 7-101(A)(3) provides: "A lawyer shall not intentionally prejudice or damage his client during the course of the professional relationship, except as required under DR 7-102(B).
[2] Rule 6-101(A)(3) provides: "A lawyer shall not neglect a legal matter entrusted to him."
[3] Rules 2-106(A) and (B) provide:

(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.
(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:
(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
(3) The fee customarily charged in the locality for similar legal services.
(4) The amount involved and the results obtained.
(5) The time limitations imposed by the client or by the circumstances.
(6) The nature and length of the professional relationship with the client.
(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
(8) Whether the fee is fixed or contingent.